# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (SOUTHERN DIVISION)

KELLY WOLFE and ODILIA MAYA     *

       Plaintiffs     *

       v.     *      Civil Case No. 8:20-cv-01246-AAQ

COLUMBIA COLLEGE, INC., et al.     *

       Defendants     *

## MEMORANDUM OPINION AND ORDER

This is a case involving claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), as well as several state law claims, including wrongful discharge, battery, intentional infliction of emotional distress, negligence, and false imprisonment. Pending before the Court is Defendants Columbia College, Inc., Susie Bae, and Hyeonjeong "Joanna" Ok's Motion for Summary Judgment. ECF No. 52. The Motion has been fully briefed, and I conclude that a hearing is not necessary under this Court's Local Rules. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons discussed below, Defendants' Motion will be granted in part and denied in part.

## BACKGROUND

Plaintiff Kelly Wolfe began working as an Admissions Representative at Defendant Columbia College, Inc. ("Columbia College" or "the College") on May 23, 2019. ECF No. 57, at 2; ECF No. 52-1, at 6. Ms. Wolfe worked at Columbia College's Silver Spring campus. ECF No. 57, at 2. In her role as an Admissions Representative, Ms. Wolfe, who is originally from Peru and of "Spanish/Latino descent," ECF No. 52-1, at 3, helped to enroll Latino students and served as an interpreter between the Latino students and other staff members, *id.* at 6; ECF No. 57, at 2. Ms.

Wolfe was supervised by Defendant Hyeonjeong "Joanna" Ok, who was the Director of the Silver Spring campus and is of Korean descent, and worked with Defendant Susie Bae, who served as an Admissions Representative and is also of Korean descent.  ECF No. 57, at 3.

Plaintiff Odilia Maya is Ms. Wolfe's mother.  *Id.*  She enrolled as a student at Columbia College in February of 2019.  *Id.*

## I.    The Events According to Plaintiffs.

Ms. Wolfe alleges that throughout her tenure at Columbia College, Ms. Ok and Ms. Bae subjected her to multiple instances of "intimidati[on] and harass[ment]."  *Id.*  Ms. Wolfe alleges that in or around June of 2019, Ms. Ok "berated" her on two separate occasions — once for telling another coworker about her pay, and another time for the way she was dressed, even though Ms. Bae had previously worn the same outfit — and that Ms. Ok "intentionally took [Ms.] Wolfe's social security card out of her purse to . . . conceal it from her."  *Id.*  Additionally, Ms. Wolfe alleges that in or around July of 2019, Ms. Bae "ripped and destroyed [Ms.] Wolfe's notes in front of her."  *Id.*  Ms. Wolfe further alleges that in or around August of 2019, Ms. Ok "grabbed and pulled [Ms.] Wolfe's hair without her consent," neither Ms. Ok nor Ms. Bae allowed Ms. Wolfe to take lunch breaks or eat in the kitchen, and Ms. Ok "intentionally" hit Ms. Wolfe in the ear while trying to force Ms. Wolfe to answer a call during her lunch break.  *Id.* at 4.  In or around September of 2019, according to Ms. Wolfe, Ms. Ok and Ms. Bae "refuse[d] to speak with Latino/Spanish students at the college," and when a Latino/Spanish student needed help on one occasion, Ms. Bae asked whether the student was Latino and whether he spoke Spanish, and then said: "I do not have time for that."  *Id.*  Ms. Bae also told Ms. Wolfe that she "can't stand listening [to] Spanish."  *Id.*  Ms. Wolfe alleges that in or around October of 2019, Ms. Bae, "in a sexually suggestive manner . . . [,] grabbed [Ms.] Wolfe from behind, without her consent, and rubbed her

body against [Ms. Wolfe's] backside," and on another occasion, "aggressively squeezed [Ms.] Wolfe's neck while she was working at a computer." *Id.* Finally, Ms. Wolfe alleges that at "various times" throughout her employment, Ms. Ok excluded her from team meetings, *id.* at 3, and Ms. Ok and Ms. Bae "refused to talk to [her] in English" and "primarily spoke to her in Korean to exclude her from discussions at work," *id.* at 4. Additionally, Ms. Wolfe alleges that Ms. Bae threatened her if she reported the harassment.[1] *Id.*; ECF No. 57-1, at 101–02.

Nonetheless, Ms. Wolfe alleges that at some point before November 4, 2019, she "asked [Ms. Ok] for a meeting to discuss the abuse or hostile work environment she was experiencing from [Ms.] Bae," and again on November 5, 2019, she asked to speak with Ms. Ok "about the discriminatory and hostile work environment that she was facing," but Ms. Ok refused to speak with her. ECF No. 57, at 5.

On November 1, 2019, Ms. Ok received an email from Leyla Sabja, a former Columbia College student. ECF No. 52-1, at 7. In the email, Ms. Sabja indicated that a representative of Columbia College had contacted her friend and former classmate to ask questions about Ms. Sabja, including whether she had bullied other students and whether she was receiving federal financial aid. *Id.* Ms. Ok suspected that Ms. Wolfe was the representative who had called Ms. Sabja's friend. *Id.*; ECF No. 57, at 9. Ms. Wolfe alleges that on either November 2 or November 4, 2019, Ms. Ok approached her about the incident involving Ms. Sabja.[2] ECF No. 57-1, at 22.

---

[1] Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment states that both Ms. Ok and Ms. Bae threatened Ms. Wolfe, ECF No. 57, at 4, but the affidavit filed by Ms. Wolfe and cited in support of that statement mentions only threats communicated by Ms. Bae, ECF No. 57-1, at 101–02.

[2] Though Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment states that Ms. Ok approached Ms. Wolfe on November 2, ECF No. 57, at 9, it is unclear from Ms. Wolfe's deposition testimony whether Ms. Ok approached her on November 2 or November 4, *see* ECF No. 57-1, at 22.

Specifically, Ms. Ok took Ms. Wolfe to a classroom and told her to write a letter apologizing for what she had done by November 5.  *Id.*; ECF No. 57, at 9.  Ms. Wolfe submitted the letter on the morning of November 5.  ECF No. 57-1, at 22.  However, she did not say "that [she] was sorry for what [she] had done"; rather, she "explained what had occurred."  *Id.*

On the evening of November 5, 2019, an altercation occurred at Columbia College.  Ms. Maya alleges that she went to Columbia College to return her textbooks and, while there, told Ali Alrubaie, an employee who had been assisting her, that she wanted to take a break from school.  *Id.* at 111–12.  Shortly thereafter, Ms. Bae came into the office where Ms. Maya was and demanded that she sign a withdrawal form.  *Id.*; ECF No. 57, at 5.  Mr. Alrubaie, Ms. Wolfe, and Ms. Ok were also present.  ECF No. 57-1, at 112.  Ms. Maya refused to sign the form because it was in English and she was not sure what it said.[3]  *Id.*; ECF No. 57, at 6.  Ms. Bae tried to force Ms. Wolfe to sign the form; she "struggled with [Ms. Maya's] arm" and then stabbed Ms. Maya in the arm with a pen.  ECF No. 57, at 6.  In the course of the alleged assault, Ms. Maya experienced "palpitations" and "got dizzy," ECF No. 57-1, at 112, and she fell and hurt her knee, *id.* at 113.  She and Ms. Wolfe were able to leave as Mr. Alrubaie and Ms. Ok held Ms. Bae "up against the wall."  ECF No. 57, at 6.  Ms. Wolfe took Ms. Maya to the hospital; while there, Ms. Wolfe reported the assault to the police.  *Id.*

The following morning, on November 6, 2019, Ms. Wolfe drove to Columbia College's Virginia campus in the hopes of speaking with President Richard Kim.  *Id.* at 8.  Ms. Wolfe was not able to speak with President Kim, but left him a handwritten note describing the altercation.  *Id.* at 8–9.  While at the Virginia campus, Ms. Wolfe allegedly spoke with Jinny Kim, Columbia

---

[3] Ms. Maya testified that she is not always able to communicate effectively in English.  ECF No. 57-1, at 109.

College's Human Resources Officer, ECF No. 52-1, at 6, who said Ms. Ok had already informed her about the altercation, ECF No. 57, at 8.  Ms. Wolfe spoke with a few other individuals, as well, including the Vice President of Columbia College, whom she informed that she had filed a police report against Ms. Bae.  *Id.* at 9.

That afternoon, after leaving the Virginia campus, Ms. Wolfe alleges that she received an email from Ms. Ok terminating her employment.  *Id.*  In the email, Ms. Ok stated that she was reiterating the verbal termination notice she had given Ms. Wolfe on November 4.  ECF No. 52-19, at 2.  Ms. Wolfe alleges that she did not receive notice of her termination, verbal or otherwise, at any point prior to receiving Ms. Ok's email on November 6.  ECF No. 57, at 10.

## II.     The Events According to Defendants.

Defendants allege that during her tenure at Columbia College, Ms. Wolfe was on positive terms with her coworkers, including Ms. Ok and Ms. Bae.  ECF No. 52-1, at 6.  Defendants represent that Ms. Ok, Ms. Bae, and Ms. Wolfe exchanged positive text messages and cite testimony from Mr. Alrubaie that the staff would bring in food to share and would sit and talk with each other.  *Id.* at 6–7.

According to Defendants, the "office dynamic . . . shifted" when Ms. Ok received the email from Ms. Sabja.  *Id.* at 7.  Ms. Ok asked Ms. Wolfe if she had called Ms. Sabja; Ms. Wolfe admitted that she had, but denied any wrongdoing, since "she had access to the information and was allowed to call students."  *Id.*  Ms. Ok, however, believed it was inappropriate for Ms. Wolfe to use student information in this manner.  *Id.*  For that reason, Defendants allege, on November 4, 2019, after consulting with President Kim, Ms. Ok "verbally notified Ms. Wolfe her employment would end in two weeks."  *Id.*

Defendants allege that the next day, November 5, 2019, Ms. Wolfe "reported to work . . . and worked without incident" until around 5:00 pm, when Ms. Maya arrived at the Admissions Office.  *Id.* at 8.  According to Defendants, Ms. Maya had come in to "dispute her daughter's termination," and an "argument" ensued.  *Id.*  Ms. Bae presented Ms. Maya with a form to withdraw from her classes and said that if Ms. Maya wanted to "stop studying," she had to sign the form.  *Id.*  Ms. Maya allegedly stated that she was unsure as to whether she wanted to withdraw, but Ms. Ok said that Ms. Maya had to decide immediately.  *Id.*  After "some argument," *id.*, Ms. Wolfe took Ms. Maya, who was upset, out of the office, *id.* at 8–9, then came back in and said, "if something happens with my mom, it's all [Ms. Bae's] fault," *id.* at 9.  Mr. Alrubaie, who witnessed the incident and recorded part of it, testified that no "physical violence, assault, attacking or hitting" occurred.  *Id.*

At the hospital, Ms. Maya "did not inform the hospital staff of any bruising, stabbing, or falling," and was "diagnosed with a panic attack and heart palpitations."  *Id.*  Ms. Wolfe called the police, who arrived at the hospital and, according to their report, spoke with Ms. Maya.  *Id.* at 9–10.  The report indicates that Ms. Bae "grabbed" and "shook" Ms. Maya's arm and "attempted to make her sign a document" and also "chased after her for a short period of time."  *Id.* at 10.  The report does not state that Ms. Bae stabbed Ms. Maya with a pen or that Ms. Maya fell during the altercation.  *Id.*

The next day, November 6, 2019, Ms. Wolfe went to Columbia College's Virginia campus and left a handwritten letter for President Kim, which described the previous evening's altercation but did not state that Ms. Bae stabbed Ms. Maya with a pen or that Ms. Maya had fallen.  *Id.*

That afternoon, Ms. Ok sent Ms. Wolfe an email with a written notice of termination, dated November 4, 2019, attached.  *Id.*  The written notice indicated that Ms. Wolfe "had exceeded the

scope of her duties in contacting former students to access private information and had not been forthcoming about her involvement." *Id.* at 10–11.  Defendants allege that when Ms. Ok sent the email, she was unaware that Ms. Wolfe had gone to the Virginia campus or left a letter for President Kim.  *Id.* at 10.

On November 7, 2019, Ms. Wolfe sent President Kim a cease and desist letter.  *Id.* at 11. The letter was written by Jasmine Moawad, "who had falsely represented herself as an attorney," and described the November 5th incident as an "aggressive situation" that included Ms. Bae "striking [Ms. Maya] with a pen, pulling her arm, and pushing [Ms. Maya] to the corner of the wall causing [Ms. Maya] to lose her balance."  *Id.*

The next day, November 8, 2019, Ms. Maya filed a statement of charges against Ms. Bae with the District Court of Maryland for Montgomery County.  *Id.*  The statement, which Ms. Moawad helped Ms. Maya prepare, indicates that on November 5, 2019, Ms. Maya was at the college for class when she overhead an argument regarding the termination of Ms. Wolfe's employment.  *Id.* at 11–12.  Ms. Maya told Ms. Bae: "If my daughter is not going to work here, I [sic] rather study somewhere else."  *Id.* at 12.  The charges against Ms. Bae were ultimately dismissed.  *Id.*

### III.    Procedural History

Ms. Wolfe filed a Charge of Discrimination against Columbia College with the U.S. Equal Employment Opportunity Commission on January 23, 2020, and subsequently received a notice of right to sue.  ECF No. 57-1, at 159, 163.  On May 19, 2020, Ms. Wolfe filed an initial Complaint in this Court.  ECF No. 1.  Defendants filed an initial Motion to Dismiss alleging Plaintiff's failure to state a claim on July 22, 2020, ECF No. 7; in response, Ms. Wolfe filed an Amended Complaint, adding Ms. Maya as a plaintiff, on August 17, 2020, ECF No. 10.  In the Amended Complaint,

Ms. Wolfe brought claims of disparate treatment, hostile work environment, and retaliation under Title VII, as well as state law claims for wrongful discharge, battery, assault, intentional infliction of emotional distress ("IIED"), and violation of the Maryland Wage Payment and Collection Act ("MWPCA").  ECF No. 10, at 6–10.  Ms. Maya advanced state law claims for battery, negligent supervision and retention, false imprisonment, and IIED.  *Id.* at 10–12.  On September 1, 2020, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 11, to which Plaintiffs filed a Response in Opposition on September 30, 2020, ECF No. 15, and Defendants filed a Reply on October 12, 2020, ECF No. 16.

On July 6, 2021, the Court granted in part and denied in part Defendants' Motion to Dismiss.  ECF Nos. 21, 22.  Specifically, the Court dismissed Ms. Wolfe's claims for sex-based disparate treatment, assault, IIED, and violation of the MWPCA.  ECF No. 21, at 17, 30–31, 33. The Court also ruled that it would exercise supplemental jurisdiction over Ms. Maya's claims.  *Id.* at 35.  Defendants filed an Answer to Plaintiffs' Amended Complaint on August 2, 2021.  ECF No. 26.  After an unsuccessful attempt at settlement, ECF No. 33, the parties notified the Court that they had substantially completed discovery, ECF No. 50.  On September 9, 2022, Defendants filed a Motion for Summary Judgment.  ECF No. 52.  Plaintiffs filed a Response in Opposition to Defendants' Motion for Summary Judgment on October 25, 2022, ECF No. 57, to which Defendants replied on October 27, 2022, ECF No. 58.  On March 7, 2023, the parties consented to my chambers conducting all further proceedings in this case.  ECF No. 63.

## STANDARD OF REVIEW

The Court will grant a motion for summary judgment only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  If there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then the Court must deny the request for summary judgment.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the nonmoving party.  *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).  "A party who bears the burden of proof on a particular claim must factually support each element of his or her claim."  *Scott v. United States*, No. PJM-06-2777, 2007 WL 3020185, at *1 (D. Md. Feb. 23, 2007).  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *See Anderson*, 477 U.S. at 256–57.  "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility."  *U.S. EEOC v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 437 (D. Md. 2020) (citing *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002)).

**ANALYSIS**

Defendants move for summary judgment on the basis that each of Plaintiffs' claims is either unsupported or contradicted by the record.  *See* ECF No. 52-1, at 4–5.  Defendants argue that since Ms. Wolfe was hired specifically because she speaks Spanish, replaced and was replaced by Latina individuals, and was not meeting Columbia College's legitimate expectations at the time of her termination, her disparate treatment and hostile work environment claims fail.  *Id.* at 4.  For these reasons, Defendants claim that Ms. Wolfe's "discrimination and harassment claims cannot meet *Iqbal-Twombley* [sic] plausibility requirements," *id.* (footnote omitted), an argument this Court already rejected by denying Defendants' motion to dismiss on all but one of Ms. Wolfe's Title VII claims, *see* ECF No. 21, at 8–9, 12–20.  Additionally, Defendants argue that Ms. Wolfe's retaliation claim fails because Ms. Ok did not have any knowledge of her complaints, her complaints were not protected activity, and she was terminated on November 4, 2019, before the incident involving her mother on November 5, 2019.  ECF No. 52-1, at 4–5.  With respect to Ms. Wolfe's state law claims, Defendants argue that Title VII preempts the wrongful discharge claim, that Ms. Wolfe "abandoned" her battery claim against Ms. Bae because she did not mention the incidents supporting that claim during her deposition, and that her battery claim against Ms. Ok "is not supported by the record."  *Id.* at 5.

Defendants also contest Ms. Maya's claims.  First, Defendants argue that there is no genuine dispute of material fact with respect to Ms. Maya's battery, false imprisonment, and IIED claims, as they are "contradicted by two eye-witnesses and are inconsistent with Plaintiffs' own contemporaneous accounts of the November 5, 2019 incident."  *Id.*  Second, Defendants claim that Ms. Maya's negligent supervision and retention claim fails because there is "absolutely no evidence" that Ms. Bae had a propensity for violence.  *Id.*

The Court addresses each claim in turn below.

I.       **Title VII Claims**

        A. **Disparate Treatment**

        Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may establish a violation of Title VII in two ways.  First, the plaintiff can present direct or indirect evidence that "both display[s] a 'discriminatory attitude' and bear[s] a causal relationship with [an] adverse employment action." *Ousley v. McDonald*, 648 F. App'x 346, 349 (4th Cir. 2016) (per curiam) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)).  Second, the plaintiff can proceed under the "burden-shifting" or "pretext" framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Ousley*, 648 F. App'x at 349 (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)).  The burden-shifting framework involves three steps: the plaintiff must first establish a prima facie case of discrimination; the burden then shifts to the employer, "who must proffer a legitimate, nondiscriminatory reason for the adverse employment action"; and then the burden "shifts back to the plaintiff to demonstrate that the employer's proffered reason was merely a pretext for discrimination."  *Id.*

        Since Ms. Wolfe proceeds under the burden-shifting framework, she bears the burden of establishing a prima facie case of discrimination.  To do so, she must show that:

> (1) [S]he is a member of a protected class; (2) [s]he suffered [an] adverse employment action; (3) [s]he was performing [her] job duties at a level that met [her] employer's legitimate expectations at the time of the adverse employment action; and (4) [her] position remained open or was filled by similarly qualified applicants outside [her] protected class.

*Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).

Defendants do not contest that Ms. Wolfe is a member of a protected class or that she suffered an adverse employment action; however, they argue that Ms. Wolfe cannot establish the third or fourth elements of her prima facie case.  Specifically, Defendants argue that Ms. Wolfe cannot demonstrate that she was satisfying the College's legitimate expectations at the time of her discharge because it is undisputed that Ms. Ok viewed Ms. Wolfe's conduct in contacting a student to seek confidential information about another student as improper.  ECF No. 52-1, at 14–15. While Ms. Wolfe disputes the wrongfulness of her conduct, she does not deny that she contacted the student and she concedes that Ms. Ok indicated such contact was inappropriate and ordered her to write a letter of apology.  *See* ECF No. 57-1, at 22.  Plaintiffs argue that Defendants have not identified any other incident where Ms. Wolfe "failed to meet the expectations of her position," ECF No. 57, at 13, but they point to no authority stating that more than one incident is necessary. *Cf., e.g.*, *Warch*, 435 F.3d at 516 (rejecting as "unworkable" the plaintiff's suggestion that the court consider whether she "met her employer's legitimate expectations *prior* to the event(s) that sparked the termination" (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 663 n.7 (6th Cir. 2000))).  Since there is no genuine dispute that Ms. Ok viewed Ms. Wolfe's conduct as inappropriate, and the Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions," *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)), Ms. Wolfe cannot establish that she was meeting the College's legitimate expectations at the time of her termination.  Thus, her prima facie case fails at this stage.

Additionally, Defendants argue that Ms. Wolfe has not established circumstances giving rise to an inference of discrimination sufficient to satisfy the fourth element of her prima facie case.  In support of their argument, Defendants cite the undisputed facts that the College hired Ms.

12

Wolfe specifically because she is a "Spanish-speaking Latina," ECF No. 52-1, at 16; *see* ECF No. 57-1, at 18, and that both Ms. Wolfe's predecessor and successor are Latinas, ECF No. 52-1, at 16; *see also* ECF No. 52-5, at 2–3. As Plaintiffs correctly note, an individual can harbor animus against certain groups of people while relying on members of those groups "for their revenue stream." ECF No. 57, at 13. Nonetheless, courts cannot "read prong four out of the prima facie case" even if "the totality of [the] evidence gives rise to an inference of discrimination," *Miles v. Dell, Inc.*, 429 F.3d 480, 487 (4th Cir. 2005), and Ms. Wolfe has not presented any argument that her case falls within one of the limited exceptions to this requirement, *see id.* at 486–89. Therefore, Ms. Wolfe's prima facie case fails on the fourth element as well.

Because, based on all of the evidence presented, Ms. Wolfe has not established a prima facie case of disparate treatment, the Court will grant Defendants' motion for summary judgment on Ms. Wolfe's Title VII disparate treatment claim.

### B.  Hostile Work Environment

An employer violates Title VII "when it subjects an employee to a hostile work environment." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022). "A hostile environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) "she was subjected to . . . unwelcome conduct"; (2) the conduct was based on her membership in a protected class; (3) the conduct was "severe or pervasive"; and (4) the conduct is imputable to

her employer.  *Laurent-Workman*, 54 F.4th at 210 (quoting *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020)).

A plaintiff does not face "a high hurdle" in establishing that the conduct to which she was subjected was unwelcome.  *Yampierre v. Balt. Police Dep't*, No. ELH-21-1209, 2022 WL 3577268, at *29 (D. Md. Aug. 18, 2022) (quoting *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018)).  "The Fourth Circuit has explained that 'an employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer.'" *Id.* (quoting *Strothers*, 895 F.3d at 328–29).  A court may also infer that the conduct was unwelcome based on "the nature of the conduct."  *Id.* (quoting *Strothers*, 895 F.3d at 329). Defendants claim that Ms. Wolfe never complained about the alleged harassment, ECF No. 52-1, at 19; ECF No. 52-6, at 12–13; however, Ms. Wolfe alleges that she twice tried to speak with Ms. Ok about the "abuse" and "hostile work environment" she was experiencing, ECF No. 57-1, at 102.  Moreover, the nature of much of the alleged conduct — including the hair pulling, neck squeezing, sexually suggestive physical contact, berating, exclusion from team meetings, and demeaning comments — suggests that it was unwelcome.  *See, e.g.*, *Strothers*, 895 F.3d at 323, 329 (finding that the nature of the conduct suggested it was unwelcome where the plaintiff's supervisor once "circled [her], lunged at her, and grabbed her pants" and also subjected her to "constant surveillance, badgering, and criticism," *id.* at 329).

To establish the second element of a hostile work environment claim, the plaintiff must "show that she was 'singled out for adverse treatment by the harasser because of her membership in a group protected by Title VII.'"  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 612 (D. Md. 2003) (quoting *Doe ex rel. Doe v. Petaluma City Sch. Dist.*, 949 F. Supp. 1415, 1423 (N.D. Cal. 1996)). This is because Title VII "is directed only at actions that occur 'because of' one of the protected

statuses." *Strothers*, 895 F.3d at 329 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). However, "harassment need not be accompanied by a contemporaneous statement of animus to be actionable under Title VII," *id.* at 330, and the requisite link "between animus and conduct may be inferred from the totality of the circumstances," *id.* at 330–31 (citing *Oncale*, 523 U.S. at 82). Thus, courts have held that where a plaintiff alleges several instances of harassment, some of which are linked to the plaintiff's membership in a protected class and some of which are neutral, it is plausible that the seemingly neutral conduct was motivated by the plaintiff's protected characteristic. *See, e.g.*, *Boyer-Liberto*, 786 F.3d at 281 n.4; *Hester v. Bd. of Educ.*, No. TDC-22-0128, 2022 WL 7088293, at *7 (D. Md. Oct. 12, 2022); *Ki v. Svnicki*, No. GJH-20-130, 2021 WL 3857855, at *7 (D. Md. Aug. 30, 2021).

Here, Ms. Wolfe has established that at least one instance of the alleged harassment was based on her sex. Specifically, a jury could find that Ms. Wolfe's allegation that Ms. Bae "grabbed [Ms. Wolfe] from behind, without [Ms. Wolfe's] consent, and rubbed her body against [Ms. Wolfe's] backside," ECF No. 57-1, at 101, was linked to Ms. Wolfe's sex. *See, e.g.*, *Davidson-Nadwodny v. Wal-Mart Assocs., Inc.*, No. CCB-07-2595, 2010 WL 1328572, at *4 (D. Md. Mar. 26, 2010) (finding that the "sexual nature" of the alleged conduct was "probative" of a sex-based link, particularly where there was "no evidence in the record indicating that the [plaintiff's workplace] had a culture of inappropriate touching or similar horseplay"); *Lewis v. Forest Pharms., Inc.*, 217 F. Supp. 2d 638, 653 (D. Md. 2002). On this point, Defendants argue only that Ms. Wolfe's allegation is "utterly unsupported," ECF No. 52-1, at 19; they do not claim that such conduct, if it in fact occurred, could not be linked to Ms. Wolfe's sex.

Additionally, Ms. Wolfe has alleged multiple instances of harassment that can be linked to her national origin. Ms. Wolfe alleges that Ms. Bae told her that Ms. Bae "can't stand listening

[to] Spanish" and said, after learning that a student who needed assistance was Latino and spoke Spanish, "I do not have time for that." ECF No. 57-1, at 101. Relatedly, Ms. Wolfe alleges that she "witnessed [Ms. Ok] and [Ms.] Bae refuse to speak with Latino/Spanish students at the college."[4] *Id.* Ms. Wolfe also alleges that Ms. Ok told her not to speak Spanish, ECF No. 52-7, at 13, and Ms. Maya states that she heard both Ms. Ok and Ms. Bae tell Ms. Wolfe not to speak Spanish, ECF No. 52-13, at 5–6. Again, Defendants do not argue that these alleged incidents cannot satisfy the second element of a hostile work environment claim, and instead deny the allegations, ECF No. 57-1, at 89, or attempt to rationalize them, ECF No. 58, at 1. A reasonable juror, however, could find that the alleged incidents communicated animus toward Ms. Wolfe's national origin. *See Laurent-Workman*, 54 F.4th at 207, 212 (explaining that coworker's "statements to [the plaintiff, who was African American] that [coworker] could not understand African Americans because they cannot speak properly communicated racial enmity," *id.* at 212). Whether Ms. Bae and Ms. Ok actually made the alleged statements and engaged in the alleged conduct hinge on credibility determinations — a task that is for the jury, rather than the judge. *See, e.g.*, *Ecology Servs.*, 447 F. Supp. 3d at 452.

Regarding the third element, to establish that the alleged conduct is severe or pervasive, a plaintiff must show that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). The environment must be "objectively hostile or abusive . . . 'from the perspective of a reasonable person in the plaintiff's position.'" *Id.* (quoting *Oncale*, 523 U.S. at 81). In determining the

---

[4] Additional support for this allegation comes from Ms. Maya, who stated in a response to one of Defendants' interrogatories: "On many other occasions, Susie Bae didn't want to help me with any questions that I had because I was Latina. Susie said if it is a 'Latina' then go get help from the Spanish woman from Columbia [sic] . . . [,] Anna Marie Gomez [Ms. Wolfe's predecessor]." ECF No. 52-13, at 6; *see also* ECF No. 57-1, at 71.

"degree of hostility or abuse," courts must consider "the totality of the circumstances," *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001), including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *id.* (quoting *Harris*, 510 U.S. at 23).  Importantly, the harassment "need not be *both* severe and pervasive: the more severe the conduct, the less pervasive the plaintiff need prove that it is." *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 413 (D. Md. 2015) (quoting *Reed v. Airtran Airways*, 531 F. Supp. 2d 660, 669 n.15 (D. Md. 2008)).  A single or "isolated" incident of harassment, if "extremely serious," can establish the requisite severity. *Boyer-Liberto*, 786 F.3d at 281 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

 As discussed above, Ms. Wolfe alleges a single incident of harassment based on her sex. Specifically, Ms. Wolfe alleges that Ms. Bae, "in a sexually suggestive manner . . . [,] grabbed [Ms. Wolfe] from behind, without [Ms. Wolfe's] consent, and rubbed her body against [Ms. Wolfe's] backside."  ECF No. 57-1, at 101.  Courts in the Fourth Circuit have indicated that "inappropriate physical touching is certainly a strong indicator of a hostile work environment." *Williams*, 86 F. Supp. 3d at 414 (quoting *Langley v. Dolgencorp, LLC*, 972 F. Supp. 2d 804, 812 n.7 (D.S.C. 2013)).  As such, when the alleged harassment "includes physical touching[,] the courts have been more reluctant to grant summary judgment." *Id.* (quoting *Brown v. Henderson*, 155 F. Supp. 2d 502, 508 (M.D.N.C. 2000)).  Indeed, courts have found single instances of physical touching similar to that alleged by Ms. Wolfe sufficiently severe to establish a hostile work environment claim. *See, e.g.*, *Jones v. Fam. Health Ctrs. of Balt., Inc.*, 135 F. Supp. 3d 372, 376, 379–80 (D. Md. 2015) (finding incident where Chief Financial Officer positioned his body so that

the plaintiff would feel his genitals rub against her backside as she walked by sufficiently severe to satisfy the third element of a hostile work environment, describing the incident as a "serious charge[] of uninvited sexual contact," *id.* at 379); *Williams*, 86 F. Supp. 3d at 405, 413 (concluding that incident where supervisor "straddled and grinded on [the plaintiff's] lap in the presence of numerous colleagues was so degrading and humiliating," *id.* at 413, as to constitute the requisite severity for a hostile work environment claim).  Thus, the Court finds that the alleged physical contact here is sufficiently severe to establish the third element of a sex-based hostile work environment claim.  Defendants do not contest that Ms. Wolfe's allegation, if true, is sufficiently severe; instead, they deny that Ms. Bae engaged in the alleged conduct.  *See* ECF No. 52-1, at 19; ECF No. 57-1, at 91.

Additionally, as described above, Ms. Wolfe alleges multiple instances of harassment based on her national origin.  Though some of this conduct — namely, Ms. Bae's and Ms. Ok's alleged refusal to help Spanish-speaking students, including Ms. Maya, *see* ECF No. 52-13, at 6 — was not directed at Ms. Wolfe, the Court can still consider it in determining the degree of hostility in Ms. Wolfe's workplace.  *See, e.g.*, *Spriggs*, 242 F.3d at 184; *Ki*, 2021 WL 3857855, at *10 n.7.  Moreover, because Ms. Wolfe has alleged that some of Ms. Bae's and Ms. Ok's conduct was based on animus toward Ms. Wolfe's national origin, the Court can consider the other alleged incidents of harassment perpetrated by Ms. Bae and Ms. Ok — including Ms. Ok pulling Ms. Wolfe's hair, berating Ms. Wolfe for her clothing even though Ms. Bae had previously worn the same outfit, berating Ms. Wolfe for telling another coworker about Ms. Wolfe's pay, excluding Ms. Wolfe from team meetings, and hitting Ms. Wolfe in the ear, ECF No. 57-1, at 100–01; Ms. Bae "aggressively squeez[ing]" Ms. Wolfe's neck, *id.* at 101, and "ripp[ing] and destroy[ing]" Ms. Wolfe's notes, *id.* at 100; and Ms. Ok and Ms. Bae not allowing Ms. Wolfe to take lunch breaks

18

or eat in the kitchen, all over a five-month timespan, *id.* at 100–01 — in determining whether the environment was objectively hostile or abusive.  *See Boyer-Liberto*, 786 F.3d at 281 n.4 (stating in racially hostile work environment analysis that a jury could consider, in addition to the plaintiff's coworker's two uses of a racial slur, "other evidence potentially indicative of severe or pervasive harassment," including the coworker's "shouting, spitting, and stalking" one night and the coworker's "use of the term 'little girl' to refer to [the plaintiff]" on one occasion); *Ki*, 2021 WL 3857855, at *9; *Hester*, 2022 WL 7088293, at *7.

In the context of race-based hostile work environment claims, courts have found similar conduct to be sufficiently severe or pervasive, even when the alleged conduct did not include "racial slurs" or "daily misconduct."  *Laurent-Workman*, 54 F.4th at 207, 211 (finding alleged conduct sufficiently severe or pervasive to survive motion to dismiss where, over roughly three years, African American plaintiff's supervisor made a derogatory comment about Black male athletes, and the plaintiff's coworker said that "[B]lacks cannot speak properly" and that she could not understand them, referred to African Americans as "you people," and subjected the plaintiff to angry outbursts); *see also Ki*, 2021 WL 3857855, at *1, *9 (finding alleged conduct sufficiently severe or pervasive to survive motion to dismiss where Asian-American plaintiff's coworker regularly mocked Asian-Americans' accents and heights and berated the plaintiff at a fire drill). Further, "[w]hile it may be true that the harassment in the instant case does not appear to be as severe as the conduct in [some] other cases, 'the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable.'"  *Ki*, 2021 WL 3857855, at *10 (internal citation omitted) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)).  The Court therefore finds that, viewed in its totality, the alleged conduct was both severe and pervasive enough to render Ms. Wolfe's work environment objectively hostile.

Finally, Ms. Wolfe must establish that the alleged harassment is imputable to her employer, Columbia College.  When a supervisor creates a hostile work environment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment," the employer will be liable if there is "some nexus between the harassment and the tangible employment action."  *Allen v. TV One, LLC*, No. DKC 15-1960, 2017 WL 4404408, at *9 (D. Md. Oct. 4, 2017) (first quoting *Faragher*, 524 U.S. at 808; and then quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 332 (4th Cir. 2012)).  If the supervisor's harassment does not result in a tangible employment action, the employer may avoid liability if it can show, "by a preponderance of the evidence, that (1) it 'exercised reasonable care to prevent and correct promptly any harassing behavior'; and (2) the plaintiff 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Spriggs*, 242 F.3d at 186 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).  With respect to harassment perpetrated by a plaintiff's coworker, however, the employer is liable "only 'if it knew or should have known about the harassment and failed to take effective action to stop it.'"  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008) (quoting *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006)); *see also Ecology Servs.*, 447 F. Supp. 3d at 452 ("The well[-]established standard in the Fourth Circuit is that the employer must have actual or constructive knowledge of the harassment.").

Here, Ms. Wolfe alleges harassment on the part of both her supervisor, Ms. Ok, ECF No. 57-1, at 43–44 (stating that Ms. Ok's "primary role was to supervise all of the staff"), and her coworker, Ms. Bae, *see* ECF No. 52-7, at 11 (stating that Ms. Bae was Ms. Wolfe's coworker, not Ms. Wolfe's boss).  It is undisputed that Ms. Ok terminated Ms. Wolfe's employment, though the parties dispute whether Ms. Ok first notified Ms. Wolfe of the termination on November 4 or

November 6.  Additionally, Ms. Wolfe alleges that prior to November 4 and again on November 5, she tried to speak with Ms. Ok about the harassment she was experiencing, but Ms. Ok refused to speak with her.  ECF No. 57-1, at 102.  Thus, although the College has proffered a legitimate, nondiscriminatory reason for Ms. Wolfe's termination, there is a genuine dispute of material fact as to whether a nexus exists between the alleged hostile work environment and Ms. Ok's termination of Ms. Wolfe's employment.  *See Allen*, 2017 WL 4404408, at *9.  Even if no such nexus exists, Defendants have not explicitly set forth the corresponding affirmative defense, though they do claim that Ms. Wolfe never reported the alleged harassment, which could indicate that Ms. Wolfe "unreasonably failed to take advantage of . . . corrective opportunities." *Spriggs*, 242 F.3d at 186 (quoting *Ellerth*, 524 U.S. at 765).  Again, there is a genuine dispute of material fact as to whether Ms. Wolfe reported the alleged harassment.  For this reason, there is also a genuine dispute of material fact as to whether the College had actual or constructive knowledge of the harassment allegedly perpetrated by Ms. Bae and whether the College failed to take effective action to stop the harassment.  *See, e.g.*, *Ecology Servs.*, 447 F. Supp. 3d at 452 (finding a genuine dispute of material fact where the plaintiff claimed she twice reported harassment to her supervisor, who denied that the plaintiff reported).

In sum, Ms. Wolfe has put forth sufficient evidence regarding her hostile work environment claim to survive summary judgment.  Because Defendants' primary argument is that Ms. Wolfe's allegations of harassment are unsupported, the Court is presented with "a quintessential credibility determination, which is not appropriate for resolution by the court on summary judgment." *Id.* For these reasons, the Court will deny Defendants' motion for summary judgment on Ms. Wolfe's Title VII sex- and national origin–based hostile work environment claims.

### C.  Retaliation

Title VII prohibits employers from retaliating against employees who oppose discriminatory conduct. *See, e.g.*, *Foster*, 787 F.3d at 249 (citing 42 U.S.C. § 2000e-3(a)). Courts in the Fourth Circuit have "[h]istorically . . . considered Title VII retaliation claims under the same standard as discrimination claims." *Id.* A plaintiff alleging retaliation, therefore, can either present direct and indirect evidence of her employer's retaliatory animus or proceed under the *McDonnell Douglas* burden-shifting framework. *See id.*

Since Ms. Wolfe has set forth her retaliation claim under the *McDonnell Douglas* burden-shifting framework, she must first establish a prima facie case of retaliation. *See id.* at 250. To do so, Ms. Wolfe must show that: (1) "she engaged in a protected activity"; (2) "her employer took an adverse action against her"; and (3) "there was a causal link between the two events." *Laurent-Workman*, 54 F.4th at 212 (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016)).

First, Ms. Wolfe must show that she engaged in a protected activity. "Employees engage in protected oppositional activity when, inter alia, they 'complain to their superiors about suspected violations of Title VII.'" *Boyer-Liberto*, 786 F.3d at 281 (quoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003)); *see also DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) ("This Circuit . . . has articulated an expansive view of what constitutes oppositional conduct, recognizing that it 'encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998))). Though the conduct opposed by the employee need not be an actual violation of Title VII in order to render the employee's opposition a protected activity, the

employee must "reasonably believe[]" that the conduct is unlawful under Title VII.  *Boyer-Liberto*, 786 F.3d at 282 (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005)).

Ms. Wolfe argues that her complaints to Ms. Ok and her handwritten letter to President Kim constitute protected activity.  Ms. Wolfe alleges that she asked Ms. Ok for a meeting prior to November 4, 2019, to "discuss the abuse or hostile work environment [she] was suffering from Susie Bae," and again on November 5, 2019, to talk about "the discriminatory and hostile work environment that [she] was facing at Columbia."  ECF No. 57-1, at 102.  While Ms. Wolfe alleges that Ms. Ok refused to speak with her, *id.*, Ms. Ok denies that Ms. Wolfe ever told her she was experiencing harassment or discrimination, ECF No. 52-6, at 12–13.  Viewing the facts in the light most favorable to Ms. Wolfe, if she did request such meetings with Ms. Ok, they would constitute protected activity, as — in light of the Court's analysis of her hostile work environment claim — she could have reasonably believed that Ms. Bae's and Ms. Ok's alleged conduct was unlawful under Title VII.  However, Ms. Wolfe's handwritten letter to President Kim on November 6, 2019, provides information only about the incident between Ms. Bae and Ms. Maya on November 5.  *See* ECF No. 57-1, at 148–49.  Because the conduct described in the letter does not violate Title VII, and Ms. Wolfe could not have reasonably believed that it did — as Ms. Maya was not an employee of the College, and the alleged stabbing arose not out of Ms. Maya's membership in a protected class but rather out of Ms. Maya's refusal to sign the withdrawal form — the letter does not constitute protected activity for the purposes of a Title VII retaliation claim.  *See, e.g.*, *Koenig v. McHugh*, No. 3:11CV00060, 2013 WL 317584, at *10 (W.D. Va. Jan. 28, 2013) (finding that the plaintiff could not have reasonably believed that a Title VII violation had occurred where there was no evidence of discriminatory conduct).

Second, Ms. Wolfe must show that the College took an adverse action against her.  In the context of a retaliation claim, an "adverse employment action" is one "that a reasonable employee would have found . . . *materially adverse*, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Brockman v. Snow*, 217 F. App'x 201, 206 (4th Cir. 2007) (second omission in original) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Thus, the meaning of "adverse action" extends beyond actions that "affect the terms and conditions of employment."  *Id.* (quoting *Burlington N.*, 548 U.S. at 64).  Here, though, it is undisputed that the College fired Ms. Wolfe, thereby altering the terms and conditions of her employment, and establishing the second element of Ms. Wolfe's prima facie case.

Third, Ms. Wolfe must demonstrate that there is a causal link between her alleged complaints to Ms. Ok and her subsequent termination.  A plaintiff can establish a causal link in two ways: First, the plaintiff can "establish the existence of facts that 'suggest[] that the adverse action occurred because of the protected activity.'"  *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021) (alteration in original) (quoting *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 784 (4th Cir. 2021) (per curiam)).  Second, the plaintiff can "establish that 'the adverse act bears sufficient temporal proximity to the protected activity.'"  *Id.* (quoting *Johnson*, 839 F. App'x at 784).  "For temporal proximity alone to establish causation," however, "the protected activity and adverse action must have occurred 'very close' in time."  *Timbers v. Telligent Masonry, LLC*, No. JKB-21-00293, 2022 WL 861849, at *6 (D. Md. Mar. 23, 2022) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam)).  Further, courts in the Fourth Circuit "have consistently required" the plaintiff to "show that the decisionmaker

was aware of the protected activity at the time the alleged retaliation occurred." *Roberts*, 998 F.3d at 124.

Here, Ms. Wolfe alleges that she complained to Ms. Ok prior to November 4, 2019, and again on November 5, 2019, and then received notice of her termination on November 6, 2019. ECF No. 57-1, at 102; ECF No. 57-1, at 23.   Again, Defendants deny that Ms. Wolfe ever complained to Ms. Ok, and they also argue that Ms. Ok verbally terminated Ms. Wolfe on November 4, 2019.  ECF No. 52-6, at 12–13; ECF No. 52-1, at 20–21.  Viewing the facts in the light most favorable to Ms. Wolfe, Ms. Ok was aware that Ms. Wolfe had complained when she terminated Ms. Wolfe on November 6, and the temporal proximity between Ms. Wolfe's second complaint and her termination is sufficiently close to establish a causal link.  *See, e.g.*, *Strothers*, 895 F.3d at 337 (concluding that the plaintiff had established causal link where she was fired the day after asking for grievance forms and stating her intent to file a formal grievance, explaining that "the lapse of one or even nine days is well-within what this Court has found to be a causally significant window of time"); *Foster*, 787 F.3d at 253 (finding sufficient temporal proximity to establish a causal link where the plaintiff was fired one month after making her second complaint); *Timbers*, 2022 WL 861849, at *6 (concluding that the plaintiff had established a causal link where he received a termination letter that had been drafted seven days after he made his first complaint and the same day he made his second complaint, explaining that a "temporal proximity of only a few days is clearly sufficient to support a reasonable inference of causation").

Since Ms. Wolfe has established a prima facie case of retaliation, the burden shifts to Defendants to provide a legitimate, nonretaliatory reason for terminating Ms. Wolfe's employment.  *Foster*, 787 F.3d at 250.  Defendants make this showing by claiming that the College terminated Ms. Wolfe because Ms. Ok "believed [she] had violated confidentiality protocols" by

contacting a former student to seek information about another former student.  ECF No. 52-1, at 22.

The burden thus shifts back to Ms. Wolfe to demonstrate that Defendants' proffered explanation is a pretext for retaliatory animus.  *See Foster*, 787 F.3d at 250.  To establish pretext, a plaintiff must show "both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct."  *Id.* at 252 (alterations in original) (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)).  In other words, the plaintiff must provide evidence that but for the employer's retaliatory animus, the employer would not have taken an adverse action against her.  *See Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).  While "[a]n employer['s] . . . inconsistent post-hoc explanations for its employment decisions is probative [evidence] of pretext," *Nnadozie v. ManorCare Health Servs., LLC*, 792 F. App'x 260, 263 (4th Cir. 2019) (per curiam) (omission and second and third alterations in original) (quoting *Dennis*, 290 F.3d at 647), "the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it," *id.* (quoting *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006)).  A plaintiff's retaliation claim should proceed "to a trial on the merits only if 'she establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse employment action was the product of . . . retaliation.'" *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 589 (D. Md. 2012) (omission in original) (quoting *Darvishian v. Geren*, 404 F. App'x 822, 828 (4th Cir. 2010)).

In this case, Ms. Wolfe relies primarily on the discrepancy regarding the date she was notified of her termination to establish pretext.  Though Defendants allege that Ms. Ok verbally

notified Ms. Wolfe of her termination on November 4, Ms. Wolfe denies receiving any verbal notification and alleges that she was first made aware of her termination via Ms. Ok's email on November 6.  Ms. Wolfe also alleges that on either November 2 or November 4, Ms. Ok began an informal disciplinary proceeding, demanding that Ms. Wolfe write a letter of apology and submit it by November 5.  ECF No. 57-1, at 22.  According to Ms. Wolfe, she submitted the letter, wherein she did not actually apologize for her conduct but "explained what had occurred," on the morning of November 5.  *Id.*  It is plausible that Ms. Wolfe's potential violation of confidentiality policies, and then her subsequent refusal to apologize for the violation, despite Ms. Ok's orders, could have served as the basis for her termination; however, Defendants make little mention of the letter, and Ms. Ok alleges that she first spoke with Ms. Wolfe about the incident on November 4, the same day that she alleges she verbally terminated Ms. Wolfe's employment.  ECF No. 57-1, at 50–51. Viewing the facts in the light most favorable to Ms. Wolfe, it is unclear why Ms. Ok would give Ms. Wolfe until November 5 to submit an apology letter but then terminate her employment on November 4, before Ms. Wolfe had submitted the letter.  Because there are genuine disputes of material fact as to whether Ms. Ok gave Ms. Wolfe the opportunity to submit an apology letter and whether Ms. Ok terminated Ms. Wolfe's employment on November 4 or November 6, a reasonable juror could find that, but for Ms. Wolfe's protected activity on November 5, Ms. Wolfe's supposed violation of confidentiality policies would not have resulted in her termination.

As this Court stated in its opinion on Defendants' motion to dismiss: "A motion for summary judgment . . . is not the appropriate time to decide which individual's story is true."  ECF No. 21, at 25.  Given the genuine disputes of material fact regarding Ms. Wolfe's engagement in protected activity and the date of her termination, the Court will deny Defendants' motion for summary judgment on Ms. Wolfe's retaliation claim.

## II.     State Law Claims

### A.  Plaintiff Wolfe

#### 1.  Wrongful Discharge

To establish a claim of wrongful discharge under Maryland law, a plaintiff must show that:

"(1) [s]he was discharged; (2) the basis for [her] discharge violated a clear mandate of public

policy; and (3) there was a nexus between [her] conduct and the employer's decision to fire [her]."

*Brooks v. Bd. of Educ.*, No. 8:20-CV-03414-AAQ, 2022 WL 17968722, at *3 (D. Md. Dec. 27,

2022) (citing *Wholey v. Sears Roebuck*, 803 A.2d 482, 489 (Md. 2002)).  Because it is undisputed

that Ms. Wolfe was discharged, this analysis will focus on the second and third elements of Ms.

Wolfe's wrongful discharge claim.

With respect to the second element:

> [F]or a public policy to support a wrongful discharge action, there
> "must be a preexisting, unambiguous, and particularized
> pronouncement, by constitution, enactment, or prior judicial
> decision, directing, prohibiting, or protecting the conduct in
> question so as to make the public policy on the relevant topic not a
> matter of conjecture or interpretation."

*Id.* at *4 (quoting *Szaller v. Am. Nat'l Red Cross*, 293 F.3d 148, 151 (4th Cir. 2002)).  Though

Defendants argue that Ms. Wolfe cannot prevail on a wrongful discharge claim because Title VII

provides an adequate remedy for her complaints, *see* ECF No. 52-1, at 22, Ms. Wolfe's wrongful

discharge claim is based not on conduct prohibited or protected by Title VII but rather on her act

of reporting Ms. Bae's alleged attack on Ms. Maya to the police, *see* ECF No. 57, at 20.  On this

point, Maryland's highest court has held that "terminating employment on the grounds that the

employee (as a victim or witness) . . . reported a suspected crime to the appropriate law

enforcement or judicial officer is wrongful and contrary to public policy."  *Wholey*, 803 A.2d at

495 (emphasis omitted).  Since Ms. Wolfe alleges that she reported the incident between Ms. Bae

and Ms. Maya to the police and was subsequently terminated, she has established the second element of a wrongful discharge claim. *See Miller v. U.S. Foodservice, Inc.*, 405 F. Supp. 2d 607, 611, 613 (D. Md. 2005) (stating that "it is in the public interest to interpret *Wholey* to apply to any person who reports a crime," *id.* at 613, and concluding that an employee who was terminated after reporting suspected criminal activity to the SEC, FBI, and a federal prosecutor had adequately stated a claim for wrongful discharge).

Third, Ms. Wolfe must show that there is a nexus between her act of reporting the incident to the police and Defendants' termination of her employment. Federal courts applying Maryland law have stated that "a short length of time between a protected activity and an adverse employment action provides strong evidence of a nexus between the two events." *Kelly v. Emerge, Inc.*, No. RDB-18-2090, 2018 WL 4913867, at *4 (D. Md. Oct. 10, 2018) (citing *Smith v. Wash. Suburban Sanitary Comm'n*, No. DKC 12-0316, 2012 WL 4863399, at *5–6 (D. Md. Oct. 11, 2012)). While Ms. Wolfe alleges that she called the police to report the assault, during her deposition, she could not remember when she made the call. *See* ECF No. 57-1, at 29–30. However, Ms. Wolfe alleges that she spoke to the police at the hospital on November 5, following the incident, even though the police report indicates that the responding officer spoke with Ms. Maya. *Id.* at 30. Additionally, Ms. Wolfe alleges that when she went to the Virginia campus on November 6 to speak with President Kim, she told the Vice President of the College that she had filed a police report. ECF No. 57-1, at 102. Thus, viewing the facts in the light most favorable to Ms. Wolfe, she has established a nexus between her act of reporting Ms. Bae's alleged assault on Ms. Maya to the police and Defendants' subsequent termination of her employment.

Because Ms. Wolfe has established all three elements of a wrongful discharge claim and Defendants have provided no evidence to the contrary, the Court will deny Defendants' motion for summary judgment on Ms. Wolfe's wrongful discharge claim.

### 2. Battery

Under Maryland law, "[a] battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 735 A.2d 1096, 1099 (Md. 1999). A battery can occur through "direct or indirect contact with the plaintiff." *Id.* at 1100. While "[i]t is universally understood that some form of intent is required for battery," there need not be "specific intent to cause the type of harm that occurred." *Id.* However, "a purely accidental touching, or one caused by mere inadvertence, is not enough to establish the intent requirement for battery." *Id.* The element of intent is "subjective" and "usually left for the jury's determination." *Id.* at 1101.

Ms. Wolfe's battery claim against Ms. Bae rests on two incidents. First, Ms. Wolfe alleges that Ms. Bae, without Ms. Wolfe's consent, came up behind Ms. Wolfe, grabbed Ms. Wolfe, and rubbed her body against Ms. Wolfe's backside. ECF No. 57-1, at 101. Second, Ms. Wolfe alleges that Ms. Bae "aggressively squeezed [Ms. Wolfe's] neck while [Ms. Wolfe] was working at a computer." *Id.* Ms. Wolfe has sufficiently alleged nonconsensual, offensive contact. *See, e.g.*, *Jones*, 135 F. Supp. 3d at 379, 384–85 (denying summary judgment on battery claim where the plaintiff alleged that her coworker intentionally positioned himself so that the plaintiff would feel his genitals rub against her as she walked by). Ms. Bae, however, denies both incidents. ECF No. 57-1, at 91–92. Since there is a genuine dispute of material fact as to whether the incidents occurred and, if so, whether Ms. Bae intended to harm or offend Ms. Wolfe, the Court will deny Defendants' motion for summary judgment on Ms. Wolfe's battery claim against Ms. Bae.

As against Ms. Ok, Ms. Wolfe's battery claim rests on at least two separate incidents.  First, Ms. Wolfe alleges that Ms. Ok "grabbed and pulled [Ms. Wolfe's] hair without [Ms. Wolfe's] consent."  ECF No. 57-1, at 100; *see also* ECF No. 52-7, at 9 (stating that when Ms. Wolfe would "let [her] hair down, [Ms. Ok] would pull on [Ms. Wolfe's] hair").  Second, Ms. Wolfe alleges that on one occasion, Ms. Ok, while attempting to force Ms. Wolfe to answer a phone call, hit Ms. Wolfe in the ear.  ECF No. 57-1, at 101.  Again, Ms. Wolfe has sufficiently established that these incidents were nonconsensual and offensive.  *See, e.g.*, *Robinson v. DarCars of New Carrollton, Inc.*, No. DKC 11-2569, 2012 WL 993405, at *1, *5 (D. Md. Mar. 22, 2012) (finding allegation that manager pulled the plaintiff's hair could constitute a battery claim).  Defendants argue that Ms. Wolfe's allegations are "utterly discredited by the record," ECF No. 52-1, at 23, but the only evidence Defendants offer to rebut Ms. Wolfe's allegations are some friendly text message exchanges among Ms. Wolfe, Ms. Ok, and Ms. Bae, *see* ECF Nos. 52-9, 52-10, 52-11; Mr. Alrubaie's testimony that Ms. Wolfe, Ms. Ok, and Ms. Bae had good relationships with each other, ECF No. 52-8, at 9–10; and Mr. Alrubaie's statement in a witness report that the office was "like a family," ECF No. 57-1, at 123, which Mr. Alrubaie later denied writing, *see* ECF No. 57-1, at 140–41.  Because none of this evidence disproves Ms. Wolfe's allegations, there is a genuine dispute of material fact as to whether Ms. Ok pulled Ms. Wolfe's hair and hit her in the ear and, if she did so, whether she intended to harm or offend Ms. Wolfe.  Therefore, the Court will deny Defendants' motion for summary judgment on Ms. Wolfe's battery claim against Ms. Ok.

### B.  Plaintiff Maya

#### 1.  Battery

Ms. Maya's battery claim against Ms. Bae arises out of the incident on November 5, 2019, during which Ms. Bae allegedly stabbed Ms. Maya with a pen.  Following the analysis of Ms.

Wolfe's battery claims above, Ms. Maya has established a genuine dispute of material fact as to her battery claim against Ms. Bae.  In support of Ms. Maya's claim, Plaintiffs offer Ms. Maya's deposition testimony, ECF No. 57-1, at 112; Ms. Wolfe's deposition testimony describing the alleged stabbing, *id.* at 28–29; photos of a bruise on Ms. Maya's arm, which Plaintiffs allege resulted from the stabbing, ECF No. 10-1, at 1; a doctor's note excusing Ms. Maya from school on November 8, 2019, explaining that Ms. Maya was experiencing "anxiety after an altercation with school staff," ECF No. 57-1, at 121; and Ms. Bae's deposition testimony describing the November 5 incident, wherein she states that Mr. Alrubaie "stopped [her from] following" Ms. Maya, *id.* at 86.

Defendants argue that Ms. Maya's battery claim against Ms. Bae is "untenab[le]."  ECF No. 52-1, at 24.  Defendants deny that the stabbing occurred, citing Ms. Ok's and Mr. Alrubaie's deposition testimony wherein each stated that they did not see Ms. Bae stab Ms. Maya with a pen. *See* ECF No. 52-6, at 10; ECF No. 52-8, at 10–11.  Additionally, Defendants note that "Plaintiffs' most nearly contemporaneous accounts of the incident" — the account provided in the hospital records immediately following the incident, the account provided in the police report that same evening, and Ms. Wolfe's handwritten letter to President Kim the following day — "make no mention" of the stabbing.  ECF No. 52-1, at 24.  Defendants argue that Plaintiffs' subsequent claims regarding the alleged stabbing thereby "contradict[]" their initial accounts.  *Id.*  Plaintiffs' supplementation of their initial accounts with additional information, however, does not inherently create a contradiction.  *Cf. Ecology Servs.*, 447 F. Supp. 3d at 440–43 (declining, despite the defendant's request, to disregard the plaintiff's declaration, which, though containing new facts, did not "flatly contradict," *id.* at 442, her prior statements).  Moreover, Ms. Wolfe testified that she did not mention the stabbing when she spoke to the police at the hospital because, at that

moment, her "mind [was] blank" and she "was in shock," ECF No. 57-1, at 30, and that she did

not mention the stabbing in her handwritten letter to President Kim because she wanted to share

that detail in person, *id.* at 33.

Viewing the facts in the light most favorable to Ms. Maya, there is a genuine dispute

regarding whether Ms. Bae stabbed her with a pen, the resolution of which depends on credibility

determinations.  Thus, the Court will deny Defendants' motion for summary judgment on Ms.

Maya's battery claim against Ms. Bae.

### 2.  Negligent Supervision and Retention

To establish a claim of negligent supervision or retention, a plaintiff must show that:

> [H]er injury was caused by the tortious conduct of [an employee],
> that the employer knew or should have known by the exercise of
> diligence and reasonable care that the [employee] was capable of
> inflicting harm of some type, that the employer failed to use proper
> care in . . . supervising or retaining that employee, and that the
> employer's breach of its duty was the proximate cause of the
> [p]laintiff's injuries.

*Jordan v. W. Dist. Co.*, 135 F. App'x 582, 589 (4th Cir. 2005) (per curiam) (second and third

alterations in original) (quoting *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp.

720, 751 (D. Md. 1996)).

For the purposes of their motion for summary judgment, Defendants contest only whether

the College knew or should have known that Ms. Bae was potentially violent, assuming for the

sake of their argument that Ms. Bae did in fact stab Ms. Maya.  ECF No. 52-1, at 26.  Prior

decisions in this Circuit have indicated that a coworker's report of an employee's dangerous

conduct can put the employer on notice of the employee's propensity for such conduct.  *See, e.g.*,

*Jordan*, 135 F. App'x at 590 (finding lack of evidence that employees' violent conduct was

foreseeable to the defendant-employer where, among other things, "no record exist[ed] of any

coworkers or customers filing a complaint regarding [the employees'] behavior prior to [the] incident" at issue); *Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F. Supp. 2d 470, 488 (D. Md. 2013) (finding lack of evidence that employer knew or should have known of employees' "propensity for tortious conduct" where, among other things, the plaintiff did not report the employees' prior conduct to "anyone associated with [the employer]"); *see also Ecology Servs.*, 447 F. Supp. 3d at 452 (finding, in context of Title VII hostile work environment claim, a genuine dispute of material fact as to whether employer had "actual or constructive knowledge" of harassment where the plaintiff claimed she twice reported harassment to her supervisor, who denied that the plaintiff reported).

Here, Ms. Wolfe alleges that on at least one occasion, she requested a meeting with Ms. Ok to discuss the "abuse or hostile work environment" she was experiencing from Ms. Bae in particular.  ECF No. 57-1, at 102.  Ms. Wolfe alleges that she again tried to speak with Ms. Ok about the harassment she was experiencing on November 5, 2019, before the alleged stabbing.  *Id.* As discussed above, this alleged abuse and harassment included one incident where Ms. Bae "aggressively squeezed" Ms. Wolfe's neck and another incident of inappropriate physical contact. *Id.* at 101.  Viewing the facts in the light most favorable to Plaintiffs, therefore, there is a genuine dispute of material fact as to whether the College knew or should have known that Ms. Bae was potentially violent.  As such, the Court will deny Defendants' motion for summary judgment on Ms. Maya's claim of negligent supervision and retention against Columbia College.

### 3.  False Imprisonment

Under Maryland law, a civil claim of false imprisonment has three elements: (1) "the deprivation of the liberty of another"; (2) "without consent"; and (3) "without legal justification."

*Pegues v. Wal-Mart Stores, Inc.*, 63 F. Supp. 3d 539, 542 (D. Md. 2014) (quoting *Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000)).

Courts have held that to establish a deprivation of liberty, a plaintiff must show that there was some "direct restraint" of her person.  *E.g.*, *Estate of Jones v. NMS Health Care of Hyattsville, LLC*, 903 F. Supp. 2d 323, 331 (D. Md. 2012) (quoting *Mason v. Wrightson*, 109 A.2d 128, 131 (Md. 1954)).  In a civil claim for false imprisonment, the meaning of "direct restraint" is "more expansive" than it is in a criminal claim, *Scott v. Old Navy, LLC*, No. 20-1253, 2022 WL 2764415, at *5 (4th Cir. July 15, 2022), such that "any deprivation by one person of the liberty of another without his consent, whether by violence, threat *or otherwise*, constitutes an imprisonment," *id.* (quoting *Mason*, 109 A.2d at 131).  Moreover, "a qualifying threat of force may be 'implicit'; an express threat is not required."  *Id.* at *6 (citing *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 112–13 (Md. 2000)).

Though Defendants argue that there is "absolutely no evidence" that Ms. Bae deprived Ms. Maya of her liberty without her consent, ECF No. 52-1, at 24, Plaintiffs have set forth evidence suggesting that Ms. Maya was not free to leave, some of which is supported by Defendants' own testimony.  To start, Ms. Maya alleges that during the November 5th incident, Ms. Bae was trying to force her to sign a withdrawal form.  *See* ECF No. 57-1, at 112; *see also id.* at 131; *id.* at 146 (partial audio recording of the incident where someone can be heard telling Ms. Maya that she needs to sign the form).  Ms. Maya testified that Ms. Bae "struggled with [Ms. Maya's] arm," *id.* at 112, and Ms. Wolfe testified that she witnessed Ms. Bae "struggling with [Ms. Maya's] arm," *id.* at 29.  Further, Ms. Maya testified that Ms. Bae "wouldn't release [her]," *id.* at 112, and, as described above, Ms. Maya alleges that Ms. Bae stabbed her with a pen.  Though Ms. Maya was ultimately able to leave, she, Ms. Wolfe, and even Ms. Bae testified that Mr. Alrubaie stopped Ms.

35

Bae from following Ms. Maya.  *Id.* at 28, 86, 113.  Based on this evidence, there is a genuine dispute of material fact as to whether Ms. Bae employed sufficient force or threat of force to restrain Ms. Maya, such that a reasonable juror could find that Ms. Bae deprived Ms. Maya of her liberty without Ms. Maya's consent.  *See, e.g.*, *Scott*, 2022 WL 2764415, at *6 (finding implicit threat of force where armed police officers told the plaintiff she was suspected of shoplifting and ordered her to accompany them back to the store, even though the plaintiff testified that the officers were "polite and professional"); *Amaral v. Amaral*, No. 0086, 2015 WL 9257028, at *8–9 (Md. Ct. Spec. App. Dec. 17, 2015) (concluding that the defendant's prior use of violence during arguments could create an implicit threat of force in similar situations).  Therefore, the Court will deny Defendants' motion for summary judgment on Ms. Maya's claim of false imprisonment against Ms. Bae.

### 4.  Intentional Infliction of Emotional Distress

For a plaintiff to establish a claim of intentional infliction of emotional distress ("IIED") under Maryland law: "(1) the conduct at issue must be intentional or reckless, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the conduct and the plaintiff's emotional distress, and (4) such distress must be severe."  *Jones*, 135 F. Supp. 3d at 383 (citing *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1063 (Md. Ct. Spec. App. 1986)).  However, "[r]ecovery under IIED is 'meted out sparingly' in Maryland, its 'balm reserved for those wounds that are truly severe and incapable of healing themselves.'"  *Id.* (quoting *Hamilton*, 502 A.2d at 1065).

Defendants argue that Ms. Maya cannot establish the second and fourth elements — extreme and outrageous conduct and severe emotional distress, respectively — of her IIED claim.  Plaintiffs face a high hurdle in establishing that conduct is extreme and outrageous: Maryland

courts will find conduct extreme and outrageous "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Ford v. Douglas*, 799 A.2d 448, 451–52 (Md. Ct. Spec. App. 2002) (quoting *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)).  Here, Plaintiffs offer the conclusory statement that Ms. Bae's alleged conduct — stabbing Ms. Maya with a pen because she refused to sign the withdrawal form — "was extreme and outrageous," ECF No. 57, at 23, without citing any comparable supporting case law or explaining how Ms. Bae's alleged conduct satisfies the requisite character and degree to establish the second element of an IIED claim.  Though Ms. Bae's alleged conduct, if true, is certainly reprehensible, it does not rise to the level that courts have found to be extreme and outrageous.  *See, e.g.*, *Wright v. Audisio*, No. CCB-21-809, 2022 WL 4608332, at *1, *3 (D. Md. Sept. 30, 2022) (finding alleged conduct extreme and outrageous where the defendant fractured the plaintiff's skull, resulting in permanent brain injury).  Therefore, the Court finds that Ms. Maya has not provided sufficient evidence to establish the second element of her IIED claim.

Plaintiffs face a high hurdle in establishing the fourth element, severe emotional distress, as well.  Not only must the plaintiff "allege a '*severely* disabling emotional response,'" *Manikhi*, 758 A.2d at 115 (quoting *Harris*, 380 A.2d at 616); she must also provide sufficient "evidentiary particulars" regarding the distress she has suffered, *id.* (quoting *Harris*, 380 A.2d at 617).  Specifically, the plaintiff must "state with reasonable certainty the nature, intensity or duration of the alleged emotional injury." *Id.*  Here, Ms. Maya alleges that the stabbing caused "tachycardia, palpitations, and dizziness."  ECF No. 57, at 23.  Ms. Maya has provided evidence that after the alleged stabbing, she sought treatment from a victim assistance therapist, physical therapist, and cardiologist.  *See* ECF No. 52-13, at 5, 7.  Ms. Maya also claims that she left her job because the

alleged assault led her to have "heart issues and trouble with [her] knee." *Id.* at 9.  Additionally, she alleges that she got into a car accident the morning after the alleged assault because her heart "palpitations start[ed] up" as she "was recalling what had happened."  ECF No. 57-1, at 114. However, this evidence falls short of the specificity required to establish the severity of Ms. Maya's emotional distress.  *See, e.g.*, *Manikhi*, 758 A.2d at 115 (affirming dismissal of the plaintiff's IIED claim where the plaintiff alleged only that she "was forced to seek medical treatment" and did "not state whether the medical treatment that she was forced to seek was of a psychological or physical nature, how long the treatment lasted, whether it was successful or is still continuing, whether it was periodic or intensive, and so forth").  Moreover, Ms. Maya's doctor indicated that she was able to return to work or school on November 8, 2019, suggesting that Ms. Maya did not suffer a severely disabling response.  ECF No. 57-1, at 121.  Altogether, Ms. Maya's allegations do not establish the requisite level of severity for an IIED claim.  *See, e.g.*, *Takacs v. Fiore*, 473 F. Supp. 2d 647, 652 (D. Md. 2007) (finding that the plaintiff's allegations of "debilitating conditions, including 'severe depression, anxiety, sleeplessness, headaches and [being] sick to her stomach'" did not establish sufficiently severe distress since the plaintiff did "not allege that she ha[d] been unable to function on a daily basis" (first alteration in original) (quoting Amended Complaint ¶ 36, *Takacs*, 473 F. Supp. 2d 647 (No. CCB-06-2343))); *see also Manikhi*, 758 A.2d at 114–15 (collecting cases).

Because the Court finds that the evidence, viewed in the light most favorable to Ms. Maya, does not support a claim of IIED, the Court will grant Defendants' motion for summary judgment on Ms. Maya's IIED claim against Ms. Bae.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is, hereby, granted in part and denied in part.

So ordered.

Date:  September 29, 2023

                                                /s/

                                       Ajmel A. Quereshi
                                       U.S. Magistrate Judge